## Volz, et al. v. Scully, et al.

(Decided May 27, 1914.)

### Appeal from Jefferson Circuit Court (Chancery No. 1).

1. **Contracts—Involving Settlement of Title to Real Estate—Want of Mental Capacity—Lack of Mutuality.**—A contract involving the settlement of title to valuable real estate executed by a woman who signed it without reading it, or having it read to her, and who was so seriously ill at the time of a wasting disease that she died fifteen hours later, was unenforcible as to her, and the signing of S. as a party to it agreeing to convey certain real estate was, therefore, without such corresponding obligation on her part, as to render the contract void, and it was properly cancelled.

2. **Contracts—When Executory Contract Not Binding.**—There must be mutuality of obligation in all contracts, and an executory contract upon which only one of the parties is bound is enforcible in equity by neither party.

B. F. WASHER, JOHN WOODBURY for appellants.

E. J. McDERMOTT, McDERMOTT & RAY and EUGENE J. COONEY for appellees.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

M. R. Scully died on the 31st of May, 1911, a resident of Oldham County, leaving a large estate consisting of real estate valued at from $160,000 to $175,000, situated chiefly in Louisville, and personal property valued at about $100,000.

He had no children or descendants, and left as his only heirs at law a brother, J. J. Scully, the appellee, who was then a resident of Bridgeport, Conn., and his wife, Emma Scully, a daughter of the appellant Rosa Volz.

His brother came to Louisville to the funeral and after the funeral had a conference with Mr. Nugent, who had been the real estate agent of M. R. Scully, and was correctly informed by him of his rights in the estate in the event there was no will. Thereafter, being in possession of this information, he went to see the widow, Emma Scully, and proposed to her that they divide the whole estate equally; she, however, hoping that there was in existence a will by which she would get a larger portion of the estate, and for which will she had already

been searching, declined this offer; they, however, made an appointment to meet the next day in Louisville, and that night she made a still further search for the will, but failed to find it. The next day when they met she offered to accept his proposition made the night before, but he had changed his mind and withdrew it.

Thereupon the widow qualified as executrix, and employed an attorney to represent her, and the appellee employed his attorney.

After this there were further negotiations between the parties looking to a final settlement, but no terms were agreed upon. Shortly thereafter, and about the middle of June, appellee returned to Bridgeport, Conn., and about the same time the attorney for Mrs. Scully went abroad and did not return until about the middle of September. During his absence there was nothing further said about an adjustment or settlement; but upon his return negotiations were again opened up between the attorneys for the parties. Mrs. Scully's attorney first insisted that she should have the value of one-half of the real-estate in fee, and subsequently asking a smaller percentage even down to twenty-five per cent; all of which propositions were declined by Scully's attorney, who all along insisted that Scully would agree only to give to his brother's widow in fee the value of her part of the real estate according to the life tables.

The matter was in this condition in November or December of that year when Scully and his daughter returned to Louisville. After his return Scully himself did not see his brother's widow, but his daughter saw her upon two occasions, the last time on Christmas Eve, 1911.

During all this period negotiations were going on between the attorneys, but no settlement was reached, J. J. Scully's attorney insisting that they would settle only upon the basis of the life tables, the interest of the widow under the life tables being 22.4 per cent.

Finally on Wednesday, January 24th, 1912, Mrs. Scully had a long conference with her attorney, and they agreed that she should accept a conveyance in fee of 22.4 per cent in value of the real estate, and she directed her attorney to close up the trade on this basis. But her attorney, notwithstanding this authority, still entertaining a lingering hope that he might procure for his client a larger percentage, insisted upon a settle-

ment upon the basis of 25 per cent in value of the fee. This, however, was again refused, and finally on Monday, January 29th, the two attorneys agreed to settle upon the basis fixed by the life tables, and they jointly dictated to a stenographer the terms of the agreement, which were in some respects somewhat complicated, and late that afternoon appellee J. J. Scully signed this agreement in duplicate at the office of his attorney. The next morning Mrs. Scully's attorney went by the office of Mr. Scully's attorney and procured these two signed agreements, and that afternoon about four o'clock Mrs. Scully signed them while ill in bed, and the next morning at seven o'clock she was dead.

Shortly after the death of Emma Scully this action was instituted by the appellee against her personal representative and Rosa Volz, her sole devisee, seeking a cancellation of the contract, and the chancellor below entered a judgment cancelling it.

This relief was sought upon three grounds, (1), that Emma Scully and the members of her family acting for her had by active and fraudulent concealment of the facts relating to her state of health induced J. J. Scully to enter into the contract, which he would not have done except for such fraudulent concealment; and (2), that the contract was not in fact signed by Emma Scully, but was in truth signed by her sister; and (3), that at the time of the execution Emma Scully was in such a weakened condition mentally and physically that she did not have mind enough to comprehend or understand the import of the writings which she signed, or the obligations therein, or the significance of her act in so doing.

In our view of the case it is unnecessary to consider either of the first two propositions, for if Emma Scully was at the time the contract was executed incapable mentally of understanding its import and significance, and the obligations which it imposed upon her, then it could not have been enforced against her if she had recovered and had sought to avoid it; and manifestly, if it was unenforceable as to one party it should not be enforced against the other.

On the Friday night before the Wednesday of her death Dr. Rapp was called in to see her, and found her in a very weakened condition which indicated that she had been sick for some time; she had fever and her pulse was rapid, and she seemed to be dull, and upon this first

visit the doctor notified the family that he suspected that she had or would have typhoid fever. He again called on her the next morning and then pronounced it typhoid fever, and suggested that she either be sent to an infirmary or that a trained nurse be procured, but at that time her mother thought she could care for her, although on Monday morning the trained nurse was sent for and came. The doctor also stated that on Saturday he suggested the calling in of a priest, and also made some suggestion about the making of a will. He also stated that she was very weak at all times after he was called in, and in a sort of stupor, her pulse weaker than her temperature would indicate, and at times she had a mild delirium. He stated that upon the occasion of the signing of the two papers he was present, and when asked by her brother if she could sign the papers he told him that he could bring them up and let her try; that her brother and his brother-in-law explained to the sick woman that she ought not to worry any more, that the business had all been attended to, and that all she had to do was to sign the papers; and that the papers were not read to her or by her; that she was propped up in bed and supported by her sister, and that her sister put her hand over that of Mrs. Scully's, and in that way the writing was signed; that she never spoke a word during this time, but nodded her head once or twice when spoken to; that during all of her illness he never heard her speak a word.

The trained nurse, Miss Seel, stated that she was called to the Volz residence in the forenoon on Monday the 29th; that Mrs. Scully was then a very sick woman; that her heart action was weak, and that although she was conscious she was stupid and dull and drowsy, and paid little attention to her surroundings; that she had nothing to say, and she only spoke four words in her presence in the two days she was there, and they were in response to a suggestion made by the witness; that in her opinion she was too sick to be worrying about business matters, and from her symptoms she would have supposed her to be in the third week of typhoid fever; that from her experience as a nurse the patient was not then in such mental condition as to be able to understand any business matters, or to understand her rights, or to take care of her interests in a business transaction, or to put her mind on business; that when the papers were

signed they were neither read to nor by Mrs. Scully, and that her sister supported her while they were signed; that the patient was weaker mentally than physically when she signed the papers, and that she was physically too weak to have signed her name as well as it appears to have been signed without considerable help.

Two other physicians were introduced as witnesses, and in answer to hypothetical questions based upon the statements of Dr. Rapp and the trained nurse, testified in substance that Mrs. Scully was probably suffering from typhoid fever, and was not mentally capable of understanding the nature and effect of the papers which were executed.

For the defendants Mrs. Volz and her two daughters, and her son and his brother-in-law testified in a general way that Mrs. Scully was perfectly conscious and had mind enough to fully understand the papers which she signed. However, they did not deny many of the essential facts as to the condition of Mrs. Scully; some of them admitted that Dr. Rapp diagnosed her case as typhoid fever; they admitted the procurement of the trained nurse; they admitted sending for one or more priests; they admitted some talk about a will; they admitted that Mrs. Scully was very sick, and had to be supported while the writings were signed; they admit that her sister supported her arm or wrist while she was signing; they admit the paper was not read to or by her.

Under this evidence it is apparent that in no event was this contract enforceable against Mrs. Scully, and it is elementary that there must be mutuality of obligation in all contracts—that is to say that both parties must be bound or neither party will be. An executory contract upon which only one of the parties is bound, and under which the party not bound has not acted, is enforceable in equity by neither party.

Under the evidence in this case no chancellor would have hesitated to relieve Mrs. Scully from the obligations undertaken by her in this paper; it was an important contract involving the settlement of the title to very valuable real estate in which she was interested, and in which her interests based upon the life tables amounted to $35,000 or $40,000, and yet the evidence is undisputed that she signed that contract without ever having read it or having it read to her; that at the time

she signed it she had been seriously ill with a wasting disease for several days; that she had to be supported or held up and her arm guided or supported while she signed it; that at the time she was not only under the care of a physician, but also her condition required a trained nurse; that at the time she signed it she was actually on her death bed, and died fifteen hours later.

If the nature of this contract was such that her personal representative and devisee desired to escape liability thereon, can it be doubted that they might easily do so? In the light of the mental and physical condition of Mrs. Scully at the time this paper was executed it was nothing more nor less than the promise by J. J. Scully to convey her in fee $35.000 or $40,000 worth of real estate without any corresponding obligation upon her part which was enforceable.

The doctrine that where one party to an executory contract is not bound it will not be enforced against the other party is so clearly based upon equitable principles and is so universally recognized and applied that citation of authority would be superfluous.

The chancellor properly cancelled the contract, and the judgment is affirmed.